# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JAMIE EVANS** | |
| **Plaintiff,** | |
| **v.** | **Case No. 1:08–cv– 0875 –ESH** |
| **WASHINGTON CENTER FOR INTERNSHIPS AND ACADEMIC SEMINARS, STEVEN KULAWY,** *et al.,* | |
| **Defendants.** | **August 25, 2008** |

## JAMIE EVANS' OPPOSITION TO THE MOTION TO DISMISS COUNT 1 AGAINST DEFENDANT THE WASHINGTON CENTER FOR INTERNSHIPS AND ACADEMIC SEMINARS

Plaintiff Jamie Evans, through counsel, respectfully submits this opposition to the Motion to Dismiss Count 1 against Defendant The Washington Center for Internships and Academic Seminars' (the Center) under Fed. R. Civ. Pro. 12(b)(6).

Count 1 concerns the Center's negligence in failing to (1) investigate Steven Kulawy, D.C. (Doctor of Chiropractic), concerning his professional credentials, or investigate the Center for Integrative Body Therapies, a.k.a. Physical Medicine Associates, LLC, (CIBT/PMA), Daniel G. Storck and National Integrated Health Associates, LLC (NIHA); (2) carry out a site visit, (3) engage in  discussion with human resources at the entities before placing Ms. Evans in the internship at CIBT/PMA.

This Court should deny the Center's Rule 12(b)(6) motion because at this stage the Court cannot make a determination, as a matter of law, that Ms. Evans was contributorily negligent concerning Dr. Kulawy's unwanted advances toward her.  Contributory negligence is a fact-

intensive question that is rarely taken away from the jury. Moreover, the cases upon which the

Center relies are at a later procedural stage — summary judgment, directed verdict and JNOV —

where the parties have obtained all the facts through discovery. A ruling on the law is premature.

The Court should deny the Center's Rule 12(b)(6) motion to dismiss.

## I. STATEMENT OF FACTS.

### A. Ms. Evans' Acceptance by the Center
### for a 2007 Summer Internship in Physical Therapy.

Ms. Evans was a 19-year-old sophomore at Stockton College, New Jersey, in March

2007. (First Am. Compl. at ¶ 10). She was interested in pursuing a career as a physical therapist.

Id. at ¶ 11. In March 2007, Ms. Evans applied to the Center for a 2007 summer internship in

physical therapy. Id. at ¶ 12. The Center accepted Ms. Evans as an intern. Id. at ¶ 13.

Ms. Evans would receive twelve college credits if she successfully completed the

internship. Id. at 14. The cost of the internship was approximately $7,200.00, for which Ms.

Evans took out a loan. Id. at ¶ 15.

On the Center's recommendation, Ms. Evans also took out a personal, high-interest loan

of $800.00 for personal expenses for the summer. Id. at ¶ 16.

### B. The Center's Failure to Investigate Dr. Kulawy.

The Center arranged for Ms. Evans to work with Dr. Kulawy, who was a chiropractor

with his practice at CIBT/PMA. Dr. Kulawy was the primary contact with the Center.[1] Id. at ¶

18. However, the Center did not visit CIBT/PMA before placing Ms. Evans at the site. Id. at 20.

---

[1] However, a July 13, 2007, letter from the Center's Managing Director, Peter J. Stephens, to Daniel G. Storck, owner and partner of National Integrated Health Associates, LLC, and owner and manager of Physical Medical Associates, LLC, concerning the Center's decision not to send any more interns there shows that the Center also had contact with Mr. Storck.

The Center did not interview Dr. Kulawy in person before placing Ms. Evans at CIBT/PMA. Id. at ¶ 21. And the Center did not investigate Dr. Kulawy's professional credentials or possible professional discipline before placing Ms. Evans at CIBT/PMA. Id. at ¶ 22.

### C. Dr. Kulawy's History of Inappropriate Sexual Behavior toward Female Patients and District of Columbia and Virginia Disciplinary Actions against Dr. Kulawy.

If the Center had carried out any investigation, it would have found that Dr. Kulawy had a history of inappropriate sexual behavior in the office. Id. at ¶ 42. The District of Columbia Health Professional Licensing Administration Board of Chiropractic suspended Dr. Kulawy's license to practice for one year on March 20, 2003, on the basis of inappropriate sexual conduct with female patients. Id. at ¶ 43. On July 14, 2004, the District of Columbia Board of Chiropractic reinstated Dr. Kulawy's license. When it did so, the Board placed conditions on the license reinstatement. The Board ordered Dr. Kulawy to: (1) complete an ethics course offered by the National Chiropractic Board, (2) continue involvement in an applicable 12-step programs and (3) hire a board-approved chaperone to be present at all times when Dr. Kulawy had any interactions with female patients. Dr. Kulawy agreed to these conditions on January 11, 2005. Id. at ¶¶ 44-45.

On November 14, 2006, however, the District of Columbia Board of Chiropractic found that Dr. Kulawy was not in compliance with the order that a female chaperone be present during all Dr. Kulawy's interactions with female patients. The Board fined Dr. Kulawy $1,000.00. Id. at ¶ 47.

In addition, on September 20, 2002, the Virginia Board of Medicine found that Dr. Kulawy had fondled the breasts of female patients and placed Dr. Kulawy on indefinite

probation.  Dr. Kulawy informed the Virginia Board that he was also under investigation by the District of Columbia Board of Medicine for inappropriately touching a female patient in June 2000.  The Virginia Board ordered Dr. Kulawy to continue therapy, complete a course on ethics, and have a chaperone present at all times during evaluation and treatment of a female patient.  Dr. Kulawy told the Virginia Board that he sold his practice in September 2002 to focus on issues that caused him to inappropriately touch his female patients.  Id. at ¶¶ 47-49, 51.

Dr. Kulawy attended Sex Addicts Anonymous meetings in support of his recovery.  Id. at ¶ 50.

On October 20, 2004, the Virginia Board terminated Dr. Kulawy's indefinite probation, but required that a chaperone be present during evaluation and treatment of female patients and that Dr. Kulawy continue therapy.  Id. at 52.  All of this information was available to the Center had anyone bothered to look.

### D.  The Center's Admonition to Summer Interns to Avoid Entanglement in Office Gossip.

At the end of May 2007, Ms. Evans came to Washington, D.C., to begin her internship.  Id. at ¶ 23.  The Center held mandatory seminars concerning appropriate behavior for interns, specifically warning interns not to get involved in office gossip.  Id. at ¶ 24.

On May 29, 2007, Ms. Evans began her internship at CIBT/PMA, working with Dr. Kulawy and several physical therapists.  Id. at ¶¶ 25-26.

### E.  The Instruction to Ms. Evans about the Open-Door Policy for Dr. Kulawy and His Female Patients.

During Ms. Evans' first few days at CIBT/PMA, Ms. Evans was informed that when Dr. Kulawy was with a female patient, the exam room door had to remain open.  No one, however, explained the reason for this open-door policy to Ms. Evans.  Id. at ¶¶ 27-28.

### F.  Dr. Kulawy's Unwanted Touching of and Comments toward Ms. Evans.

Dr. Kulawy began making advances and comments to Ms. Evans.  He repeatedly approached Ms. Evans from behind when she was typing and massaged her shoulders.  Dr. Kulawy repeatedly wrapped his arm around Ms. Evans' waist when they were walking through the office.  Dr. Kulawy repeatedly made comments to Ms. Evans' about her appearance.  Id. at ¶¶ 29-32.

As a result of Dr. Kulawy's advances, Ms. Evans became anxious and uncomfortable when working around Dr. Kulawy.  She stopped wearing make-up and changed her clothing style to make herself less attractive in an effort to stop Dr. Kulawy's conduct.  Upset, Ms. Evans called her parents about Dr. Kulawy and asked her parents how to handle him.  She frequently drove home to New Jersey to seek her parents' comfort.  She also asked her fellow summer interns for advice on these unwanted advances.  Id. at ¶¶ 33-37.

### G.  The Site Visit of the Center's Representative to CIBT/PMA in mid-July 2007.

It was not until mid-July 2007 that a Center employee, Julie Zimmerman, conducted a site visit at CIBT/PMA, where she met with Dr. Kulawy.  As Ms. Zimmerman left the office, Ms. Evans followed her out the door and reported Dr. Kulawy's unwanted touching and comments.

Ms. Evans also told Ms. Zimmerman about the open-door requirement whenever Dr. Kulawy was treating a female patient.  <u>Id</u>. at ¶¶ 53-55.

However, instead of going back in to speak with Dr. Kulawy herself, Ms. Zimmerman instructed Ms. Evans to find out the reason for the open-door policy.  <u>Id</u>. at ¶ 56.

### H.  The Result of Ms. Evans' Inquiry about the Open-Door Policy and Telling about Dr. Kulawy's Unwanted Advances.

When Ms. Evans asked about the open-door policy, a CIBT/PMA employee told her that the open door was necessary in light of Dr. Kulawy's previous inappropriate touching of female patients and fondling their breasts.  <u>Id</u>. at ¶ 57.  Ms. Evans then told Kathleen Troust, a physical therapist whom she had worked with during the internship, that Dr. Kulawy was inappropriately touching her (Ms. Evans') and commenting about her appearance.  Ms. Troust immediately thereafter confronted Dr. Kulawy in his office with the door closed.  Ms. Evans overheard Ms. Troust screaming at Dr. Kulawy concerning his behavior with Ms. Evans.  <u>Id</u>. at ¶¶ 58-59.

### I.  Dr. Kulawy's Confrontation with Ms. Evans.

Later that same day, Dr. Kulawy called Ms. Evans into his office.  Dr. Kulawy instructed Ms. Evans to sit down and stood between her and the door, preventing Ms. Evans from leaving.  Dr. Kulawy asked her in a derisive, threatening manner if it was all right to close the door.  <u>Id</u>. at ¶ 60.

This was Ms. Evans' last day at CIBT/PMA.  On the Center's recommendation, Ms. Evans did not return to work there.  <u>Id</u>. at ¶ 61.

### J.  The Adverse Consequence of Dr. Kulawy's Inappropriate
### Touching of and Comments toward Ms. Evans.

Dr. Kulawy's unwanted touching of and comments toward Ms. Evans caused her to stop

leading a normal life.  She stopped showering, refused to take part in touring and other

recreational activities associated with the summer internship, and stayed in bed watching

television.

As a result of Dr. Kulawy's unwanted touching and comments, Ms. Evans changed her

career choice to environmental science to avoid the discomfort and bad memories of working in a

personal-interaction profession.  Ms. Evans also becomes emotionally and physically distressed

when she remembers Dr. Kulawy's unwanted conduct toward her.  Id. at ¶¶ 62-64.

## II.  STANDARDS FOR RULE 12(b)(6) MOTIONS TO DISMISS.

### A.  The Courts Do Not Favor Rule 12(b)(6) Dismissals.

A court does not grant a Rule 12 (b)(6) motion to dismiss as a matter of course.  Rather,

as this Court has explained:

> It must first be pointed out that a motion to dismiss under Rule 12
> of the FRCP is merely a decision on the pleadings, and for that
> reason, it is granted sparingly and with caution.

KWF Industries, Inc. v. American Telephone and Telegraph Co., 592 F. Supp. 795 (D.D.C.

1984).

This Court also warned that:

> A motion to dismiss for failure to state a claim should be granted
> only if "it appears beyond a doubt that [the plaintiff] can prove no
> set of facts in support of his claim which would entitle him to
> relief."  ...  Moreover, as a general rule, a complaint should not be
> dismissed under Rule 12 (b)(6) because the court doubts that the
> plaintiff will prevail in the action." ...  The purpose of a Rule 12
> (b)(6) motion "is to test the formal sufficiency of a statement of the

> claim for relief; it is not a procedure for resolving a contest about
> the facts or merits of a case.  5A C. WRIGHT & A. MILLER,
> FEDERAL PRACTICE AND PROCEDURE § 1356, at 294 (2d
> ed. 1990).

<u>Fraser v. Gottfried</u>, 636 A.2d 430, 432 (D.C. App. 1994).  (Some citations omitted).[2]

Moreover,

> [A] complaint [should not] be dismissed under Rule 12 (b)(6) on
> the ground that no evidence has been offered by Plaintiffs since we
> take the facts alleged in the complaint as true, and the presentation
> of evidence to counter a Rule 12 (b)(6) motion is not required.

<u>In re Estate of Joseph P. Curseen v. Ingersoll</u>, 890 A.2d 191, 194 (D.C. App. 2006).

The Center asks this Court to dismiss the negligence claim against it based on Ms. Evans'
alleged contributory negligence, a fact-intensive inquiry usually reserved for the jury.[3]  Granting
the motion to dismiss would be a ruling on the merits, outside the realm of Rule 12(b)(6).

Additionally, the standards for deciding a Rule 12(b)(6) motion, which the Center
discusses (Center's Mem. at 5), favor the plaintiff.  First, the court must "construe the complaint
liberally in the plaintiff's favor, accept[ing] as true all of the factual allegations contained in the
complaint."  <u>Aktieselskabet Af 21, November 2001 v. Fame Jeans, Inc.</u>, 525 F.3d 8, 15 (D.C.
Cir. 2008).  The plaintiff should also receive "the benefit of all reasonable inferences derived
from the facts alleged."  <u>Id</u>.

---

[2]  Superior Court Civil Rule 12 is identical to its federal counterpart, F. Rule Civ. P 12.  <u>Bible
Way Church v. Beards</u>, 680 A.2d 419, 427 fn. 5 (D.C. App. 1996).

[3]  Ms. Evans will establish in the Argument that contributory negligence is rarely a question of
law.

Given the above, the Center cannot claim, as it does, that it meets the standard for a grant of a Rule 12(b)(6) motion to dismiss. The Court must deny the motion.

### B. The Precedent the Center Principally Relies Upon Does Not Involve Rule 12(b)(6) Motions.

The Center cites a plethora of decisions for its argument to dismiss this case at the outset, pursuant to a Rule 12(b)(6) motion. The decisions the Center relies upon, however, are not dismissals under Rule 12(b)(6). Rather, the courts grant the dismissals, based on contributory negligence, after all discovery is complete, or during or after a trial.

To preserve court efficiency, Ms. Evans will not point out all the cases that the Center cites in support of its motion. The Center has indicated in its Table of Authorities upon which cases it principally relies. Ms. Evans will indicate the procedural posture of these decisions.

The cases involving summary judgments are Thomas v. Washington Industrial Medical Center, Inc., No. 98-1652, 1999 U.S. App. LEXIS 16771 (4th Cir. July 19, 1999);  Andrews v. Wilkens, 934 F.2d 1267 (D.C. Cir. 1991); Maalouf v. The Swiss Confederation, 208 F. Supp.2d 31, 34 (D.D.C. 2003); Doe v. Prudential Ins. Co., 860 F. Supp. 243 (D. Md. 1991); and Quigley v. Speedy Muffler King, 745 F. Supp 3 (D.D.C. 1990).

Other cases the Center cites concern directed verdicts, *e.g.*, Craig v. Greenbelt Consumer Servs., Inc., 222 A.2d 836 (Md. 1966); Phillips v. D.C. Transit Sys., Inc., 198 A.2d 740 (D.C. 1964), and Suger v. Traub, 196 A.2d 869 (Md. 1964).

Others deal with JNOV's:  Campbell v. Montgomery County Bd of Edu., 533 A.2d 9 (Md. Ct. Spec. App. 1987) and Payne v. Restaurant Corp. of America, Civ. No. 8766-74 (D.D. Super. June 10, 1976).

These cases are irrelevant to whether this Court should grant a Rule 12 (b)(6) motion to dismiss.  A reading of these cases demonstrates that the courts had all the developed facts at hand.  Discovery was over.  There were no facts left, as here in Ms. Evans' instance, to develop.

The precedent the Center cites simply does not support dismissing the negligence claim against it and finding contributory negligence against Ms. Evans.  The Center asks this Court to make a judgment on the Complaint, without even an answer having been filed.  To do so would be premature.  The Court must deny this Rule 12(b)(6) motion to dismiss.

### III.  ARGUMENT.

#### A.  The Question of the Center's Duty to Investigate Dr. Kulawy and Place Ms. Evans in an Internship that Did Not Expose Her to Sexual Harassment Raises Factual Questions that Preclude Grant of a Rule 12(b)(6) Motion.

The Center's Rule 12(b)(6) motion to dismiss essentially asks this Court to make a finding on the merits that the Center did not owe a duty to Ms. Evans to investigate Dr. Kulawy and place her in an internship safe from sexual harassment.

Ms. Evans asserts that had the Center investigated Dr. Kulawy it never would have placed Ms. Evans in this vulnerable position of working with someone guilty of sexual misconduct against female patients and possibly female co-workers and staff.

The Center holds itself out as having "more than 30 years of experience and [a] reputation for program quality."  *See* their website at http://www.twc.edu/students/why.shtml.

This expertise in placing college internships should include making sure that a placement is safe.

Moreover, the Center held mandatory seminars for interns about how to deport themselves during the internship. Discovery is necessary to see if the Center provided any education concerning sexual harassment, which is a major work force issue. The Center cannot argue that sexual harassment would be an unforeseeable event. Again, though, this discussion is a factual one, which the Center attempts, through this motion to dismiss, to avoid.

Silvers v. Associated Tech. Instit., Inc., No. 93-4253, 1994 Mass. Super. LEXIS 506, at *1 (Super. Ct. Mass. Oct. 12, 1994), constitutes authority for finding an educational placement service has a duty to investigate a prospective employer or internship. In Silvers, the female plaintiff, who suffered sexual assault and harassment by an employer to whom the defendant's placement office referred her, sued the placement service for negligence in referring her to the employer. Id.

The plaintiff had enrolled in the school and paid tuition to the defendant, a state-licensed post-secondary vocational school. The school's placement office provided students and graduates with "placement support services," including referrals to employers who had openings in the students' field of studies. Id.

The placement procedure involved taking "job orders" from private companies, sending relevant orders to the students, and, with the students' permission, sending the students' resumes to the companies. The placement service, however, did not train its staff or establish policies to deal with any job order that could include unlawful or discriminatory employment practices. . Id. at 2.

The plaintiff completed her school work and sought employment from the placement office. Id.

The placement director shortly thereafter received a telephoned job order from a Mr. Harrington of Winchester International Group, Inc., who sought a "Female tech for Communications switching complex – a lot of travel – part-time." Mr. Harrington told the placement director that he preferred a female technician "because he found they had better skills in dealing with the public." Id.

The plaintiff ended up working for Mr. Harrington for less than a month. She alleged that while employed there, Mr. Harrington had sexually assaulted and harassed her, forced her to share a room with him on business trips, walked naked in her presence, touched her against her will and forced her to have intercourse with him. Mr. Harrington finally fired her for refusing to give in to his sexual demands. Id. at *4.

The Silvers plaintiff reported her employer's conduct to the school, which took no action. Id. She claimed that she suffered emotional distress, loss of self-esteem and persistent loss of sleep as a result of the experience. Id.

In its defense, the school filed for summary judgment, claiming that it did not have a duty to investigate the employer and could not foresee the employer's acts. Id. at **5-6. The court responded that:

> Whether one undertakes an obligation contractually ... or voluntarily ..., the actor must perform with due care.... Here, having received tuition payments, defendant [the school] agreed to furnish its students a training program and job placement service. Defendant thus committed itself to exercise due care in delivering those services.

Id. at 6-7. (Citations omitted).

The court also suggested that a special relationship could exist between the school and the

plaintiff, creating a duty on the school to protect its students from a third person's wrongdoing.

Id. at 7.  In this regard, the court noted:

> As the harm that safely may be considered foreseeable to the
> defendant changes with the evolving expectations of a maturing
> society, so change the "special relationships" upon which the
> common law will base tort liability for the failure to take
> affirmative action with reasonable care.

Id. at 7-8.  The court concluded:

> Here, defendant's students, including plaintiff, could reasonably
> expect that the school's placement office would make some effort
> to avoid placing them with an employer likely to harm them.

Id. at 8.

The Center in this case claims that Ms. Evans gave up her right to complain against it for

failing to investigate Dr. Kulawy because she signed a contract in which she agreed to:

> Inform in a timely and reasonable manner, the agency and/or TWC
> [the Center] of any problems that may occur, including concerns
> regarding substantive work issues, during the course of the
> internship.

(Center Mem., Exhibit A, Internship Agreement at 1).

In Silvers, the defendant school relied upon a similar agreement that the plaintiff signed,

which stated:

> I understand that ATI [the school] assumes no responsibility for
> and does not guarantee employment at any time or in any field.

Silvers 1994 Mass Super. LEXIS 506, at *8.  The Court found that this contract did not negate

the plaintiff's expectation that the school's placement office would take the effort to avoid

-13-

placing her with an employer who would harm her.  <u>Id</u>.  This same conclusion is appropriate here.

<u>Keck v. American Employment Agency Inc.</u>, 652 S.W.2d 2 (Ark. 1983), provides additional authority for finding that the Center owed Ms. Evans a duty of care to investigate Dr. Kulawy and protect her from an injurious internship.  In <u>Keck</u>, the plaintiff sued an employment agency for negligence in  referring her to an employer who abducted and raped her.  The plaintiff claimed that the agency was negligent in failing to investigate the background of the employer, determine whether the employer had a legitimate business and warn the plaintiff that the agency had not conducted a background check on the employer before referring the plaintiff to him.  <u>Id</u>. at 296.

The employer himself visited the agency and his appearance was "bad."  As the court explained:

> He had on blue jeans and a t-shirt with the word "bullshirt" on it,
> had long hair and a beard, and was evidently unkempt.

<u>Id</u>. at 299.  The agency did not make any background check on the employer, did not ask for references and did not make any site visit or learn that the employer rented an office an hour after he visited the employment agency.  A background check would have revealed that the employer lived in a flop house.  <u>Id</u>.

The agency claimed that it did not have a duty to investigate the individual and was could simply accept at face value his claim of being an employer.  <u>Id</u>.

The court rejected the employment agency's argument, saying

> We believe that a cause of action for negligence against the
> employment agency was properly stated and was based on the
> agency's duty of care which arose out of its contractual relationship

-14-

> with [the plaintiff], its ability to foresee some danger to her, and
> because it had some degree of control over the employers it made
> available.  This control could have been exercised by making
> further checks on [the employer]. ...  The employment agency
> created its relationship with [the plaintiff] by offering its services
> and thereby put itself in the position of owing a duty to her; and
> that duty in this case went beyond merely producing a man who
> claimed to be an employer.

Id. at 300-01.

The Keck court found that the question of the agency's negligence was a question for the jury.  Id. at 302-03.  The court also noted that:

> Whether [the plaintiff] was negligent was, of course, a jury
> question as well.

Id. at 303.  Keck supports Ms. Evans' position that a Rule 12(b)(6) motion to dismiss is inappropriate.

At this early stage of Ms. Evans' case, genuine issues of fact abound.  What was the Center's procedure, if any, for investigating agencies or businesses for placing interns?  Did the Center follow this procedure with Dr. Kulawy?  If not, why not?  Was there any suggestion of Dr. Kulawy's sexual proclivities and disciplinary history for his sexual misconduct that the Center should have investigated?  Did the Center call any references about Dr. Kulawy?  Did the Center ever speak with Mr. Storck?  Did the Center instruct interns on employment discrimination and sexual harassment?  Why did the center wait for over a month to make a site visit?  This list can go on.  Only through discovery can Ms. Evans and the Court gain the necessary answers.

Thus, the question of the Center's negligence raises a multitude of factual issues.  This Court must therefore deny the Center's Rule 12(b)(6) motion to dismiss.

-15-

**B.  Contributory Negligence Is a Question of
Fact and Rarely a Question of Law, and a Rule 12(b)(6)
Dismissal of a Case on Based on this Defense is Inappropriate**.

The Center's Rule 12(b)(6) motion to dismiss asks this Court to make a ruling as a matter

of law on an issue that is rarely decided on this basis.  As the D.C. Circuit has explained:

> Whether a plaintiff is contributorily negligent is usually a question
> for the jury.  Only in exceptional cases will questions of negligence
> [and] contributory negligence ... pass from the realm of fact to one
> of law.  Unless the evidence is so clear and undisputed that fair-
> minded men can draw only one conclusion, the questions are
> factual and not legal. ...  Indeed, it is the rare case with evidence so
> clear and unambiguous that contributory negligence should be
> found as a matter of law.  ...

Paraskevaides v. Four Seasons Washington, 292 F.3d 886 (D.C. Cir. 2002) (Summary judgment

denied where hotel claimed guests' storing $1.2 million worth of jewelry in safe in suite was

contributory negligence).

Given the facts alleged in the First Amended Complaint, this action is not one of those

"exceptional cases" in which the question of contributory negligence "pass[es] from the realm of

fact to one of law."  The facts so far cannot lead fair-minded individuals to conclude that Ms.

Evans' failure to alert the Center about Dr. Kulawy's unwanted advances constituted contributory

negligence.

The irony of the Center's arguments — contributory negligence, repeat exposure, failure

to exercise due care to avoid injury and avoidable consequence — is that they rely on extensive

recitation of the facts of each case, cases which, as Ms. Evans has already pointed out, deal with

summary judgments, directed verdicts and JNOVs, all rulings after discovery and a full

disclosure of the facts. These cases involve rulings on the merits, something which is in the future for Ms. Evans' action.

The crux of the Center's argument is that Ms. Evans did not report Dr. Kulawy's sexual advances to the Center. For example, what procedures, if any, did the Center have in place for reporting problems? Why did not the Center not send someone for a site visit until more than a month after Ms. Evans began working with Dr. Kulawy? Did anyone from the Center ever meet with Ms. Evans at any previous time to inquire about possible problems with the internship? If not, why not?

Yet, the first time the Center representative visited the site, Ms. Evans told her about the open-door policy with Dr. Kulawy's female patients..

The Center argues that Ms. Evans repeatedly exposed herself to the risk. Yet, Ms. Evans took, what in her mind, constituted protective measures. She stopped wearing make-up and changed her clothing style to make herself less attractive to Dr. Kulawy. She took steps to stop Dr. Kulawy from making unwanted advances to her.

This situation is the classic one of an individual with power and authority, Dr. Kulawy, taking advantage of a subordinate and a young woman without any experience in a professional office setting. She had no warning of Dr. Kulawy's sexual proclivities. Although the office staff told her about the open-door policy with Dr. Kulawy's female patients, no one informed her of the reason for this policy. No one, according to the facts at this point, warned her about Dr. Kulawy's sexual harassment.

Dismissing the case as a matter of law under Rule 12(b)(6) is premature and disregards the fact-finding necessary in this case.

## CONCLUSION.

In light of the above, this Court should deny the Center's Rule 12(b)(6) motion to dismiss.

Respectfully submitted,

**KLIMASKI & ASSOCIATES, P.C.**

August 25, 2008
_/s/  Lynn I. Miller_____
Lynn I. Miller, #941559

August 25, 2008
_/s/  James R. Klimaski_____
James R. Klimaski, #243543

Klimaski & Associates, P.C.
1625 Massachusetts Avenue NW
Suite 500
Washington, DC  20036-2245
(202) 296-5600
Fax:  (202) 296-5600
Klimaski@Klimaskilaw.com
Miller@Klimaskilaw.com

***Attorneys for Jamie Evans***

**Certificate of Service**

I certify that the foregoing *Jamie Evans' Opposition to the motion to dismiss Count I of the First Amended Complaint against Defendant The Washington Center for Internships and Academic Seminars* will be served to the following counsel for defendants through the Court's CM/ECF electronic notification system – upon the successful uploading and filing of electronic copies of the above – on August 25, 2008:

Leslie H. Wiesenfelder
Dow Lohnes PLLC
1200 New Hampshire Ave. NW
Suite 800
Washington, DC 20036-6802
Fax  202-776-4726
lwiesen@dowlohnes.com

Alan Dumoff
Law Office of Alan Dumoff
30 Windbrooke Circle
Gaithersburg, MD 20879
Fax  301-987-0971
alandlmc@aol.com

  */s/  Jon Pinkus*
Klimaski & Associates, P.C.

-19-